We're now going to move to our second case of the morning. This is Appeal 22-2208 Stefen Escamilla v. United States, and we're going to hear first from Mr. Monroe. Thank you, Your Honor. May it please the Court. Federal law prohibits the possession of a firearm by anyone who has been committed to a mental institution. Mr. Escamilla, in this case, admits that he had been admitted to a mental institution, but he disputes whether he had been committed. The government says he's been committed, and that dispute forms the crux of this case. Now, under 27 CFR 478.11, in order for an admission to a mental institution to count as a commitment, three things must be true. First of all, the admission must be involuntary. Secondly, the admission must be a formal one. And third, it must be ordered by a court, board, commission, or other lawful authority. I'm going to take those each in turn. As to voluntariness, Mr. Escamilla both filed a declaration, and he was deposed by the government, in which he testified that he was at the hospital voluntarily and that he agreed to be admitted voluntarily. That's all the testimony there was. The government didn't have any rebuttal testimony at all on that point. And this was a motion for summary judgment by the government that was granted. The district court essentially resolved a dispute of fact in favor of the government in awarding summary judgment to the government, which, of course, it should not have done. Because there was a dispute of fact, summary judgment just plain shouldn't have been awarded, but at the very least, any dispute should have been resolved in favor of Escamilla. Mr. Monroe, after he was admitted, let's just say admitted to the hospital, if he wanted to leave, if he wanted to get up, walk out, could he have done that? Well, we don't know that for sure. He did testify in his paper, in his declaration, that he never sought to leave. He wanted to be there. He agreed with the doctor at the hospital that he should be there. And in fact, when they discharged him, he said he wanted to stay longer because he thought he was benefiting from it. So we don't know the answer to your question. But doesn't the statute, section 9.39, which is the statute that he was admitted pursuant to, provide that he's not free to leave? If he would have been admitted pursuant to 9.13, he may have been permitted to leave, but that's not the statute that he was admitted pursuant to. Well, the statute doesn't say exactly. The form that the government relies upon for involuntariness is styled somewhat as a notice to Mr. Escamilla. Mr. Escamilla denies receiving it, however, and the government has nothing to dispute that. But assume he had received it, what the form says to Mr. Escamilla is you're going to be in the hospital for up to 15 days. During that time, three things can happen. You can be discharged, you can remain as a voluntary patient, or you can be converted to involuntary. Of course, being discharged wouldn't have any effect on the voluntariness, so the two things we're left with are you can remain a voluntary patient or you can convert to involuntary status. And I would submit that no reasonable person would read that and infer from that that they were there on an involuntary basis. The only way you can remain voluntary or convert to involuntary is if you're voluntary to begin with. Now I'm going to move on to the other requirements, the first one being formality. The government doesn't actually put forth any evidence that the admission was formal, whatever that means. It was carried out by filling out a form by someone at the hospital. We don't know who. The government has not identified anyone who filled out the form. And secondly, moving on to the court, board, commission, or other lawful authority, the government doesn't assert that there was a court involved. There wasn't. The government doesn't assert that there was a board involved. There wasn't. And the government doesn't assert that there was a commission involved. Again, there wasn't. The government doesn't directly say that there was other lawful authority, but that's really all they could possibly go with. And under the doctrine of ad justum generis, the other lawful authority must have the same kind and character as the other things in the list, court, board, or commission. Now the thing that courts, boards, and commission have in common is that they're government entities with power to, with judicial or quasi-judicial power, that is, they adjudicate. Here, what we have, according to the government, is two physicians that signed this form. Now, a couple of doctors aren't a government entity. They don't have any authority to adjudicate. They didn't make any findings of that, conclusions of law or judgment or anything like that. I mean, to kind of put it in the vernacular, if a court, board, or commission were an NBA final, this was a pickup game in the hospital parking lot. They're just not the same. On that point, though, what, in your view, is the legal effect under the 9.39 regime of the two physicians certifying that a patient qualifies to remain in the program beyond the 48 hours? You know, it's difficult to say because there are several provisions in the New York mental health law. And, in fact, one of the cases that the government relies on, the Waters case, was actually reviewing a different section that has very similar provisions. So it's hard to say, really, reading those different sections of the statute, and 9.31 particularly, to know exactly why it's different. It's called an emergency admission, but it doesn't really say it's involuntary. It doesn't really say it's voluntary. It's emergency. I don't know why it's necessary for two physicians to sign for an emergency to exist, but that doesn't make it involuntary. As we read 9.39, though, why would that statute give so many procedural protections if it wasn't formal or if it wasn't done by lawful authority? There's all these steps that the patient can take ab initio, requesting a court hearing, served with notice of his rights, the court was required to hear testimony. Aren't those protections there because this is a formal commitment? If those protections were required, as they are in some states, that could make it formal. If we were in a state where you had to get a court order to involuntarily commit somebody, that's a formal procedure. But here we've got a situation where a patient gets admitted. He can ask for a hearing if he wants to, and that would be formal, but it would be after the fact. It wouldn't be a priori the way it probably should be. But the fact that the law allows for a post hoc hearing I don't think makes the initial admission involuntary. What about formal, though? Again, there was no hearing. There was no request for a hearing. There wasn't any of that. If that had been invoked, I guess that would be formal, but it didn't happen. So we don't have a formal commitment just because it's possible that you could have a formal review of the admission. That doesn't make the admission itself formal. Wouldn't 922G4 have been written to include court involvement if that was a requirement? It certainly could have. But here we have a federal regulation, and the government's bound by its own regulations. So the fact that the ATF has promulgated a regulation saying it has to be a formal commitment by a court, board, commissioner, or other lawful authority, the government's bound by that. What type of deference does that do? Is that Skidmore deference? Is that the level we're at or some other deference to that administrative regulation? It's not a matter of deference because the court's not bound by it, but the government is. So we have a party to the case that's bound by that regulation. So it can't have a result that's outside of that regulation. Now, the government relies, I mentioned the Waters case, that's a 1994 Second Circuit case where the Second Circuit found a different section of the New York law to be an involuntary commitment. I don't think Waters applies here for a couple of reasons. One, as I said, it was a 1994 case. It even predates the regulation. So the Waters court didn't even have an opportunity or need to consider whether it was a formal commitment and court, board, commissioner, or other lawful authority because that regulation didn't exist. That was passed in 1997. And secondly, the Waters court, because it was 1994, didn't have the benefit of the Heller case, the McDonald case, and the Ruin case from just last year. So it didn't have an opportunity to consider the Second Amendment ramifications of two doctors signing a form and the result is someone's permanently deprived of the opportunity to possess firearms. I've mentioned in the brief all the other circuits besides the Second Circuit that considered this issue of whether there has to be some court, board, or commission. All of them that have considered it have ruled that there must be, and they tend to say a court because that's what you normally find. I'm not sure there are any states that have boards or commissions. And in fact, the First Circuit in the Relander case said there has to be robust judicial involvement in order for an admission to a mental hospital to be involuntary and to be a commitment. We don't have that here. Mr. Monroe, as we're talking now, do you know whether the ATF or the Attorney General of the United States has certified any program in New York as complying with the federal statute for relief from the disability that the statute would otherwise impose? I don't know if it has. I know the government raised that issue, but the government didn't say that that process had been certified. And because Mr. Eskami hasn't taken part in it, I don't think it's really, doesn't really matter. But I don't know the answer to your question. No, it could. Okay. Hypothetically, the existence of such a certified program can very much mitigate against some of the avoidance points that you're making, you know, in light of Bruin and Heller and all that. That's the only point of the question. Okay. Fair enough. I don't know. I don't know the answer either. That's why, yeah. New York has a program, though, correct? New York has a program. And that's federally funded, correct? What program? When you asked if they had a program, I thought you meant they had a relief for disability. Yeah, that's what I'm saying. Judicial review of any denial of a certificate, correct? I don't know if it's federally funded or not. Yeah, or certified by the AG or by ATF as complying with the federal requirements for a qualified program. Right. I don't know that. Would you like to reserve the remainder of your time? I would. Thank you. Thank you very much. Mr. Monroe will now move to the argument from the government. Mr. Tableson. Good morning. May it please the Court. My name is Benjamin Tableson, and I represent the United States. For 11 days in 2019, the appellant was committed to the custodial care he was retained in the inpatient mental health unit of New York's Samaritan Hospital because he had been determined to pose a danger to himself or others. He had been committed to that institution pursuant to Section 9.39 of New York's mental hygiene law, and unless he went to New York courts to challenge that commitment, which was his right to do but which he declined to do, he could not have left. It's your question, Judge Kirsch. He may not have wanted to leave. It was not up to him. He could not have left either way. That core fact answers the central question before this Court, and every court to consider whether New York's Section 9.39 admissions procedures constitute commitments for purposes of the federal criminal code, every court to consider that question has agreed that it does. Contrary to the appellant's claim, there is no constitutional issue that needs to be avoided here. Heller and McDonald explicitly state, they do not cast doubt on longstanding prohibitions on gun possession by the mentally ill. Bruin does not disturb that as is underscored by the concurrences in Bruin. There is no constitutional issue here, particularly in light of the fact that, unlike in the state of Maine procedures discussed in the First Circuit's Relander case, the appellant had first the due process protections of an elaborate procedural scheme of notice, hearing, review, and judicial approval, and second, unlike in Relander, a robust process to restore any rights he lost via his commitment. As the default issue in this case, Judge Griesbach described the government's failure to timely answer the complaint as not commendable, that is an understatement. But Judge Griesbach, as a legal matter, got the consequences of that exactly right. At this stage, unless no reasonable person could agree that Judge Griesbach should have decided this on the merits, the appellant cannot meet his standard on that issue. As to cost, the government believes at this stage the court should remand for the narrow purpose of correctly calculating deposition costs. The cost of the court reporter's time was properly taxed. It appears the cost of the transcript pages was not. Mr. Tableson, if we go to the kind of main legal issue here a little bit, step back from the facts here and the application of law to fact. The case, as Judge Brennan's questions were getting at a few minutes ago to Mr. Monroe, it kind of gets at the need to define what other lawful authority means, right, that way. How would you recommend that we articulate that test? The test here is whether- What's that standard? I'll start from the-I won't step back fully. I'll start from the way that lawful authority was delegated here. Here we have a New York State legislature that has promulgated a state law delegating authority to hospital directors to hold in custody individuals who have an acute mental health need for treatment, observation, and care. The New York hospital directors then create a procedure in line with the requirements of the state law, such that admitting physicians make a determination as to whether an individual is a serious danger to themselves or others. And those are precisely the procedures that were followed here. That is, by my lights at least, a lawful authority. I thought you'd add one point. I thought you would add that it's all occurring under the kind of watchful eyes of the third branch of New York government, the judiciary. Judge Cutter, that is exactly right. So the appellant here had immediate recourse to the New York State courts. And although he declined to avail himself of that process, he had that process available to him. That is essential. And so in light of the fact that the regulation we've been discussing discusses a court-board commission or other lawful authority, and indeed the other lawful authority operates under the protective umbrella of the courts, I don't think there are due process issues here. Mr. Chamblisson, what's your response to Mr. Monroe's ad justem generis argument with regard to or other lawful authority? Thank you, Judge. It's related to precisely the point I was just making, which is that the other lawful authority here is operating under the protective umbrella of the courts. Indeed, Mr. Escamilla could have availed himself of that court process. So to say that another lawful authority is outside the bounds of a board or a commission I think is not correct, and to say it is so far removed from a court as to not constitute compliance with the regulation is not correct in light of that recourse to the courts. Thank you, Mr. Chamblisson. Thank you, General. Mr. Monroe, we'll go back to you for a rebuttal argument. Thank you. Just a couple of points. The government asserted that he couldn't leave, but there's nothing on the record to indicate that. There's simply no evidence that Mr. Escamilla couldn't have left if he wanted to. That's just the government saying he couldn't, but we don't know that. And as for the other lawful authority, the government is essentially saying that anything else that's done that's legal and that's subject to judicial review is other lawful authority. But that's kind of throwing away the whole concept of e justum generis and just going to kind of the plain meaning of the words other lawful authority without paying any attention at all to the other things in the list. There's nothing about a couple of doctors signing a form that's anything close to a court, board, or commission. And the fact that it was subject to judicial review doesn't save it from that. I think his argument is a shade different than that. I think what he's saying is suppose a world where the New York statute does not exist. It doesn't exist. And your client thought, look, I'm suffering here. I should go check myself in. Let's go to the hospital. I agree. And then after a few days at the hospital, he decides that he was just going through a rough period and he's going to leave. But he's okay. He can move on and function. He's going to head back to the base that way. In that circumstance, the doctor could say, I think that's really ill-advised. I think you should stay that way. But that's not occurring pursuant to this kind of holistic statutory scheme that your adversary is pointing to. It's a different world. When the doctor certifies here that your client continued to qualify beyond the 48 hours, that certification is occurring pursuant to a statutory scheme that has other parameters, including ones that if your client were to disagree, you could seek judicial relief. Isn't that a distinction? I guess I don't see the distinction because your hypothetical sounded like it was doctor's advice that he should stay but not a doctor physically forcing him to stay. No, no, no. No physical force. But here the certification, right, the reason those two physicians certified her, it has a legal effect beyond just their medical judgment. It has an effect vis-à-vis 9.39. Does it not? Well, we don't know what that effect is. I guess that's part of what this case is about is did that make it involuntary just because a couple of doctors signed the form or not? Well, it makes it lawful to hold him. I'm trying not to use the word commit, right? It makes it lawful for him to be there for at least another 15 days. It makes it lawful for him to be there, certainly. The question is could he have been there without the doctor signing the form. I would submit that he could have been. But unless the signing of the form had some legal effect such as making it so that he could not leave even if he wanted to, which we don't know if that's the case or not, then that doesn't make it a commitment just because the form got signed. So my point was if anything that's lawful can't just be other lawful authority because it basically ignores the other things in the list that precede it. Thank you, Your Honor. I would, or Your Honors, I would encourage you to reverse. Thank you very much, Mr. Monroe. Thank you very much, Mr. Tableson. The case will be taken to revision.